<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DOMINIC OGUEJIOFO,**<br><br>  *Plaintiff*,<br><br>   **v.**<br><br>**BANK OF TOKYO-MITSUBISHI UFJ, LTD., et al.,**<br><br>  ***Defendants.*** | **Civil Action No. 14-4513**<br><br>**OPINION** |

 **THIS MATTER** comes before the Court by way of Defendants Bank of Tokyo-Mitsubishi UFJ, LTD. ("BTMU"), Yawer Fadoo, and Pavan Borra's (together, "Defendants"), motion for summary judgment against Plaintiff Dominic Oguejiofo ("Plaintiff"). Dkt. No. 45. For the reasons stated below, Defendant's motion is **GRANTED**.

## I. BACKGROUND

 In this employment suit, Plaintiff claims that he was discriminated against on the basis of his race and national origin in violation of Title VII of the Civil Rights Act ("Title VII") 42 U.S.C. § 2000e and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, *et seq*. ("NJLAD").

 Plaintiff is an African-American man who was born in Nigeria. <u>See</u> Defendants' Rule 56 Statement ("Defs.' R.56 Stmt.") ¶ 9, Dkt. 45-14; Plaintiff's Responsive Statement ("Pl.'s Resp. Stmt.") ¶ 9, Dkt. No. 48. Plaintiff served as a Vice President at BTMU from September 2012 until he was terminated in August 2013.

### A.  Plaintiff's Responsibilities at BTMU

Plaintiff began his at-will employment at BTMU's Jersey City, New Jersey office on September 14, 2012.  Defs.' R.56 Stmt. ¶¶ 25-26.  At the time, BTMU's Jersey City office consisted of back office operations, including departments within its Information Technology ("IT") organization.  Id. ¶ 18.  Plaintiff served as a Vice President of IT's Management Compliance Systems ("MCS") department.  Id. ¶ 25.  The corporate job title hierarchy within MCS, from lowest to highest was as follows:  Analyst, Associate, Vice President, Director, and Managing Director. Id. ¶ 21.  Within the MCS department, Plaintiff was assigned to work on the Data Warehouse team. Id. ¶ 27.

One month into Plaintiff's employment, his direct supervisor, a Director, left BTMU.  Id. ¶ 30.  Thereafter, Pavan Borra, a Vice President, supervised Plaintiff on a temporary basis, from approximately October 2012 to April 2013.  See id. ¶ 31; Declaration of Pavan Borra ("Borra Decl.") ¶ 1, Dkt. No. 45-9.  Yawer Fadoo, a Managing Director within MCS, was Plaintiff's second-level manager from the time of Plaintiff's hire until March 2013.  See Defs.' R.56 Stmt. ¶ 32; Declaration of Yawer Fadoo (Fadoo Decl.") ¶ 2, Dkt. No. 45-10.

Mr. Borra is an Asian-American man whose national origin is Indian.  Id. ¶ 20.  Mr. Fadoo is an Asian-American man whose national origin is Pakistani.  Id.

Plaintiff's job functions included: designing and architecting technical solutions for BTMU's Data Warehouse IT systems; evaluating tools and strategies for using and integrating business data; presenting data model designs and strategies to other departments in the IT organization; and monitoring IT staff.  Id. ¶ 33.  Plaintiff's duties consisted of both long-term, discrete projects, as well as "daily operational" tasks.  Id. ¶ 20; Plaintiff's Supplemental Statement ("Pl.'s Supp. Stmt.") ¶ 5c, Dkt. No. 48.

Plaintiff was assigned to two major projects.  First, he was assigned to the Core Banking Replacement ("CBR") project, with the objective to replace the bank's Legacy IT System.  Id. ¶ 5e.  Second, Plaintiff was also assigned to the "T360" project, with the purpose of replacing the bank's Finance IT system.  Id. ¶ 5f.  Plaintiff's specific role on the CBR and the T360 projects was to serve as an "IT Lead" to, in his words, "lead the project, provide technical guidance on how we were going to implement the data . . . [and] design the new environment."  Id. ¶ 6a.  Plaintiff was assigned deliverables in the course of his work on the CBR and T360 projects.  Defs.' R.56 Stmt. ¶¶ 43, 46.  As a Managing Director and Plaintiff's second-level manager, Mr. Fadoo approved Plaintiff's assignments as the Data Warehouse IT Lead for the CBR and T360 projects.  Id. ¶ 47.

In addition, Plaintiff's daily operational duties included conducting nightly data batch runs.  Id. ¶ 36.  He was responsible for notifying the business team of any batch run disruptions, and resolving disruptions.  Id. ¶ 38.

**B. Plaintiff's Disagreement with Mr. Borra and Mr. Fadoo over IBM Project: November – December, 2012**

In 2012, BTMU engaged International Business Machines Corp. ("IBM") to provide consulting services in connection with the CBR project.  Id. ¶ 49.  Plaintiff was temporarily assigned to meet with IBM while a co-worker who was primarily responsible for facilitating the engagement was absent from the office in late 2012.  Id. ¶ 52.

On November 26, 2012, Plaintiff updated Mr. Borra and Mr. Fadoo on the status of his communications with IBM.  Id. ¶ 54.  Plaintiff advised that the new data model proposed by IBM could not be integrated into the current data model for the Data Warehouse.  Id. ¶ 55.  Mr. Fadoo expressed his objection, noting "we had specifically asked IBM to work within our framework."  Id.  While Mr. Borra and Mr. Fadoo believed that "a small portion could be redesigned," Pl.'s

Resp. Stmt. ¶ 56, Plaintiff believed that the Data Warehouse required a larger overhaul, Defs.'
R.56 Stmt. ¶¶ 58-59.  He expressed his opinion about the Data Warehouse to other employees at
BTMU.  Id. ¶ 56.

According to Plaintiff, the disagreement over changes to the Data Warehouse led to a rift
between him and his supervisors.  See Pl.'s Supp. Stmt. ¶¶ 12b, 16.  After Plaintiff "challenged"
his supervisors, Mr. Borra and Mr. Fadoo allegedly "continuously found fault with [P]laintiff."  Id.
¶ 13.  Mr. Fadoo "became very agitated" when he saw Plaintiff, Id. ¶ 15b, and "got irritated" when
he walked into Plaintiff's office, criticizing him for keeping the office door closed.  Id.

### C.  Plaintiff's Reassignment: January - February 2013

On January 15, 2013, four months into Plaintiff's employment, Mr. Borra received an email
from the CBR project manager, Niranjan Patwardhan, to discuss Plaintiff's role in the CBR project.
Defs.' R.56 Stmt. ¶ 70.  During their meeting, Mr. Patwardhan expressed that he was losing
confidence in the Data Warehouse team's deliverables.  Id. ¶ 71.  On January 23, 2013, Mr.
Patwardhan sent Plaintiff an email, copying Mr. Borra, indicating that Plaintiff had missed a
January 18 deadline for the CBR project.  Id. ¶ 72.

That same day, January 23, 2013, Mr. Borra also received an email from Sanjiv Thakur, a
Vice President who oversaw the T360 project, to discuss project status.  Id. ¶ 73.  During their
meeting, Mr. Thakur expressed that Plaintiff was not maintaining open communication about
project status, and did not consider Mr. Thakur's proposals.  Id. ¶ 74.

The next day, January 24, 2013, Mr. Borra communicated Mr. Thakur's concerns to
Plaintiff.  Id. ¶ 75.  On January 26, 2013, Mr. Borra sent an email to the Data Warehouse team,
including Plaintiff, reminding them of upcoming time-sensitive project deadlines.  Id. ¶ 76
Plaintiff replied to Mr. Borra, asking him to send communications about the Data Warehouse

4

directly to Plaintiff going forward rather than to other team members.  Id. ¶ 77.  Mr. Borra replied, reminding Plaintiff of his responsibilities to manage the project.  Id. ¶ 78.

On January 28, 2013, Mr. Borra received an email from Wai Li, a Data Warehouse team member, informing him that Plaintiff lost his temper during team meetings.  Id. ¶ 79.  The next day, on January 29, Mr. Borra received an email that Plaintiff had failed to complete two mandatory training sessions.  Id. ¶ 80.

Around this time, Mr. Borra identified deficiencies in Plaintiff's daily operational tasks. For instance, Plaintiff did not identify and address two production-related issues that occurred between December 2012 and February 2013.  Id. ¶ 81.  As a result, Mr. Borra was required to resolve the issues.  Id.

On or about February 1, 2013, Mr. Borra met with Plaintiff to discuss his job performance. Id. ¶ 82.  During their meeting, Mr. Borra explained his concerns about Plaintiff's missed deadlines and Plaintiff's focus on the IBM project over his primary role as IT Lead on the CBR and T360 projects.  Id. ¶ 83.  Mr. Borra sent a summary of the meeting to Mr. Fadoo.  Borra Decl. ¶ 15.

In early February 2013, Plaintiff was reassigned away from his IT Lead roles on the CBR and T360 projects.  Fadoo Decl. ¶ 8.  Mr. Fadoo approved the decision.  Id.  Plaintiff continued his work as a "senior team member" on the CBR project.  Defs.' R.56 Stmt. ¶ 86.  Ms. Li was asked to replace Plaintiff as IT Lead.  Pl.'s Resp. Stmt. ¶ 20.

Plaintiff's Vice President position and compensation were not affected in any way after he was reassigned away from the Data Warehouse IT Lead role.  Defs.' R.56 Stmt. ¶ 87.  At all times during his employment, Plaintiff remained a Vice-President at the same rate of pay.  Id. ¶¶ 45, 88.

**D.  Plaintiff's Requests for Diversity Training: January – June 2013**

In January 2013, BTMU sent out a memo promoting diversity training to all employees. Oguejiofo Ltr. to EEOC, Pl. Ex. 16 at 2, Dkt. No. 48-2.  Plaintiff responded to the email, requesting further discussion on diversity training.  Id.  In late January or early February 2013, he met with Tamika Jackson, a Human Resources representative, to discuss "Inclusive Diversity Training."  Id.

On March 19, 2013, BTMU held a quarterly Town Hall meeting.  Id.  During this session, Plaintiff asked Mike Gotimer, BTMU's Chief Information Officer, what was being done to improve diversity.  Id. at 3.  A few days later, Mr. Gotimer invited Plaintiff to his office to discuss diversity.  Id.

In June 2013, BTMU published its first module on "inclusion diversity training" through its American subsidiary, Union Bank.  Id.

**E.  Plaintiff's Annual Performance Review: April 2013**

On March 4, 2013, BTMU hired Alexander Prazdnik to fill the vacant Director position in the MCS department.  Id. ¶ 89.  At this point, Mr. Prazdnik replaced Mr. Fadoo as Plaintiff's second-level manager.  Id. ¶ 90.  Mr. Prazdnik remained Plaintiff's second-level manager until Plaintiff's employment ended on August 14, 2013.  Id. ¶ 91.

In April 2013, Mr. Borra prepared an annual performance evaluation of Plaintiff, covering the period from September 4, 2012 through March 31, 2013.  Id. ¶¶ 95-96.  Mr. Borra drafted the review with input from Mr. Fadoo and Mr. Prazdnik.  Id. ¶ 97.  On or about April 29, 2013, Mr. Borra and Mr. Fadoo delivered Plaintiff's annual evaluation to him.  Id. ¶ 98.

On a scale of 1 (Below Expectations) to 5 (Outstanding), Plaintiff was given a rating of 2, which was defined as "Performance meets some requirements with development needed to achieve greater consistency in meeting expectations.  Needs to demonstrate more initiative.  If an overall

rating, formal written mid-year evaluation will be required." Id. ¶ 99. The evaluation cited both Plaintiff's accomplishments and criticisms of his performance. Id. ¶ 100. For example, the report noted that Plaintiff's projects fell "behind schedule at critical points," and referenced his issues with the nightly batch schedule runs. Id. ¶ 101. The evaluation also incorporated Mr. Thakur's feedback, noting that his view was that Plaintiff did not assign importance to his input, and was not open to other people's ideas. Id. ¶ 103.

Plaintiff immediately expressed his disagreement with the performance evaluation to Monique Adams, Vice President of Human Resources. Id. ¶ 105. Plaintiff then prepared a 10-page written rebuttal to his performance evaluation, which did not make any reference to discrimination. Id. ¶¶ 107-8.

During the same review period, a score of 2 was given to three other employees, two of whom self-identified as White, and the third as Asian. Id. ¶ 110.

On April 29, 2013, Mr. Prazdnik hired Madhavi Mannepalli to lead a component of the CBR project. Id. ¶ 112. At that time, Mr. Prazdnik reassigned Plaintiff to work under Ms. Mannepalli. Id. ¶ 105. She replaced Mr. Borra as Plaintiff's direct supervisor. Id. ¶ 115.

**F.  Plaintiff's Reports Against Mr. Borra and Mr. Fadoo to Senior Management**

On May 20, 2013, Plaintiff emailed BTMU Chief Information & Operations officer Michael Gotimer, copying Monique Adams and others, regarding the "situation at MCS." Id. ¶ 117. In the email, Plaintiff alleged that Mr. Borra and Mr. Fadoo made "working difficult and uncomfortable based on their behavior toward [him]." Id. ¶ 119. Plaintiff alleged that: (1) Mr. Fadoo berated Plaintiff for keeping his office door closed, and for sitting in his office; (2) Plaintiff's performance evaluation contained "false and or misleading statements;" and (3) Mr.

Borra and Mr. Fadoo were "bent on finding fault" with Plaintiff to "get [him] fired." Id. ¶¶ 120-22.

Ms. Adams responded to Plaintiff's email, requesting more information. Id. ¶ 124. Plaintiff then provided a log of seven incidents from December 2012 through May 2013 when Mr. Fadoo "yelled" or "rebuked" Plaintiff. Id. ¶¶ 125-27. Ms. Adams subsequently interviewed Mr. Borra and Mr. Fadoo in June 2013 as part of an investigation into Plaintiff's allegations. Id. ¶ 130. Neither men corroborated Plaintiff's allegations. Id. ¶ 132.

Also in June 2013, Plaintiff's then-supervisor, Mr. Prazdnik, informed Ms. Adams that Plaintiff experienced difficulty getting along with others, and was resistant to constructive professional criticism. Specifically, "when [a] decision was made to go in a different direction or not completely adopt all the changes and all the recommendations, [Plaintiff's] attitude changed . . . . It went from much more courteous and professional to more adversar[ial]." Id. ¶ 141. In July, Mr. Prazdnik reported to Ms. Adams a number of recent incidents where Plaintiff had ignored team protocol by refusing to review data model design with Ms. Mannepalli and other team members. Id. ¶ 143.

**G. Mid-Year Evaluation and Termination: July – August 2013**

Pursuant to the terms of Plaintiff's annual evaluation, Ms. Mannepalli conducted a mid-year evaluation of Plaintiff in July 2013. Id. ¶ 147. Ms. Mannepalli commented that one "[a]rea for development/growth" was to "communicate effectively with team members on . . . expectations, status and deliverables" and to "take ownership and contribute effectively in team discussions." Id. ¶ 148. Ms. Mannepalli did not consult with Mr. Borra or Mr. Fadoo in connection with the mid-year evaluation. Id. ¶ 149.

Mr. Pradznik then reviewed Plaintiff's 2013 mid-year evaluation before delivering it to him.  Id. ¶ 150.  After meeting with Plaintiff to discuss the evaluation, on July 30, 2013, Mr. Prazdnik sent a memorandum to his managers, recommending that Plaintiff be released from his position, effective August 2, 2013.  Id. ¶ 155.  Mr. Prazdnik made the decision alone without input from Mr. Borra , Mr. Fadoo, or Ms. Mannepalli.  Id. ¶ 149.

On August 2, 2013, Plaintiff left the office early due to a "family emergency."  Pl.'s Supp. Stmt. ¶ 31a.  Upon his return on August 14, 2013, Plaintiff was notified about BTMU's decision to terminate his employment during a meeting with Mr. Prazdnik, Ms. Adams, and Tamieka Mattison, another member of the HR Department.

### H.  Plaintiff's EEOC Complaint and This Lawsuit

Plaintiff filed a complaint with the EEOC on August 2, 2013, asserting claims of discrimination.  See Compl. ¶ 16, Dkt. No. 1; Pl.'s Opp'n Br., Ex. 15 at 2, Dkt. No. 48-2.  Plaintiff filed a corresponding complaint with the New Jersey Division On Civil Rights on September 24, 2013.  Compl. ¶ 16.  On April 23, 2014, the EEOC issued a Final Determination, permitting Plaintiff to bring suit in Federal Court.  Id.

Plaintiff commenced this lawsuit on July 17, 2014, asserting disparate treatment discrimination and hostile work environment claims under Title VII and NJLAD against Defendant BTMU.  Compl. ¶¶ 1-17.  In addition, Plaintiff asserts these claims against Mr. Borra and Mr. Fadoo as aiders and abettors under NJLAD.  Id.  Defendants now seek summary judgment on all claims.

## II.  LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available

affidavits, show that there is no genuine dispute as to any material fact and that the moving party

is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247

(1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted

only if there exists no genuine issue of material fact that would permit a reasonable jury to find for

the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  All facts and

inferences must be construed in the light most favorable to the non-moving party.  Peters v. Del.

River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## III. ANALYSIS

### A. Disparate Treatment Discrimination

Plaintiff alleges disparate treatment discrimination on the basis of race and national origin

arising from: (1) discriminatory assignments; (2) demotion; (3) denied promotion; (4) negative

performance evaluations; and (5) termination.[1]  Defendants argue that these claims should be

dismissed because Plaintiff fails to establish a prima facie claim of discrimination.  In addition,

Defendants argue that they have met their burden of providing legitimate, non-discriminatory

reasons for their actions, which Plaintiff cannot rebut.  The Court agrees.

Plaintiff's Title VII and NJLAD discrimination claims are governed by the same legal

framework. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087-88 (3d Cir. 1996) (unlawful

---

[1] Defendants argue that Plaintiff is barred from raising a discrimination claim on the basis of national origin because he did not mention national origin in his original complaint filed with the Equal Employment Opportunity Commission ("EEOC"). Defs.' Br. at 6 n.3, Dkt. No. 45-13. This is unpersuasive.  The limit of the district court action is "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 399-400 (3d Cir.1976).  Mere "failure to check a particular box on an EEOC charge . . . is not necessarily indicative of a failure to exhaust the mandatory administrative remedies." Schouten v. CSX Transp. Inc., 58 F. Supp.2d 614, 616 (E.D. Pa. 1999). Here, Plaintiff's EEOC complaint alleges a set of facts that, if investigated, would also raise claims based on national origin.  Accordingly, the Court will consider discrimination claims arising from race and national origin.

discrimination claims under NJLAD "parallel" Title VII claims); McKenna v. Pacific Rail Serv., 32 F.3d 820, 827 (3d Cir. 1994) ("The New Jersey Supreme Court has generally looked to standards developed under federal anti-discrimination law for guidance in construing [NJLAD].").

Plaintiff alleges discrimination based on circumstantial evidence.[2] As such, Plaintiff's disparate treatment claims are subject to the McDonnell Douglas burden-shifting framework. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); see also Victor v. N.J., 203 N.J. 383, 408-09 (2010). Under this framework, a plaintiff must first establish a prima facie case of unlawful action by the employer. McDonnell Douglas, 411 U.S. at 802. "To establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'" Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001)).

To establish a prima facie claim for employment discrimination, a plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination." Robinson v. Horizon Blue Cross Blue Shield of N.J., No. 12-cv-2981, 2015 WL 4603647, at *4 (D.N.J. July 30, 2015) (citing Rodriguez v. Nat'l R.R. Passenger Corp., 532 F. App'x 152, 153 (3d Cir. 2013)).

If the plaintiff meets this initial burden, the burden shifts to the defendant, who must articulate legitimate, non-discriminatory reasons for its employment decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008);

---

[2] Plaintiff concedes that no supervisors at BTMU, including Mr. Borra and Mr. Fadoo, ever uttered comments regarding Plaintiff's race or national origin. Pl.'s Resp. Stmt. ¶¶ 10-11, 93, 152.

<u>Victor</u>, 203 N.J. at 408 n.9.  This burden has been described as "'relatively light,'" and is deemed "satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." <u>Burton</u>, 707 F.3d at 426 (quoting <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006)).  Once the employer meets its burden of articulating a legitimate, non-discriminatory reason, the burden again shifts to the employee to present evidence from which a factfinder could infer that the proffered reasons were pretextual. <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999); <u>Victor</u>, 203 N.J. at 408 n.9.

    1.  <u>Discriminatory Work Assignments, Demotion, and Denied Promotion</u>

Defendants argue that Plaintiff's discrimination claims arising from discriminatory work assignments, demotion, and denied promotion fail because these incidents do not constitute adverse employment actions.  The Court agrees.

An adverse employment action is one by an employer "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Jones v. SEPTA</u>, 796 F.3d 323, 326 (3d Cir. 2015) (quoting <u>Storey v. Burns Int'l Sec. Serv.</u>, 390 F.3d 760, 764 (3d Cir. 2004)) (internal quotation marks omitted); <u>see also</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761-62 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with different responsibilities, or a decision causing a significant change in benefits . . . . A tangible employment action in most cases inflicts direct economic harm.").

First, the work assignments do not constitute adverse employment actions.  Plaintiff claims that he received discriminating assignments "which were excessive and required extensive hours at work and at home."  Compl. ¶ 4.  While Plaintiff does not identify specific assignments, he appears to refer to his responsibilities as an IT Lead on the CBR and T360 projects where he "was

doing three people's work at some point." Pl.'s Supp. Stmt. ¶ 30.  However, these assignments do not constitute adverse employment actions because they were his original responsibilities that he was tasked with when he was hired, Pl.'s Resp. Stmt. ¶ 52, and thus do not constitute a change in employment status at all, let alone a significant change.

Second, Plaintiff alleges he was discriminatorily "demoted" when he was reassigned away from IT Lead to "senior team member" on the CBR and T360 projects.   Plaintiff contends that the reassignment was a demotion because two younger employees, Ms. Li and Ms. Mannepalli, took over the IT Lead roles.  See Pl.'s Supp. Stmt. ¶¶ 20, 64b.  However, this was not an adverse employment action because it was a reassignment, not a demotion, and Plaintiff suffered no change in job title, pay or benefits as a result.   The reassignment was a mere change in reporting relationship.  See Walker v. Centocor Ortho Biotech, Inc., 558 Fed. App'x 216, 219 (3d Cir. 2014) ("Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions.") (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  Indeed, despite the assignment change, Plaintiff maintained his title as Vice President at the same rate of pay throughout his employment.[3]

Lastly, Plaintiff alleges that he experienced "denials of promotion." Compl. ¶ 6.   A denied promotion constitutes an adverse employment action where a plaintiff demonstrates that he "is qualified for and was rejected for the position sought, and that non-members of the protected class were treated more favorably."   Bennun v. Rutgers State University, 941 F.2d 154, 170 (3d Cir.

---

[3] To the extent that Plaintiff contends that his reassignment from the IT Lead role to senior team member on the two projects constitutes a discriminatory work assignment, this argument also fails. Plaintiffs' reassignment within the CBR and T360 teams did not result in any change in job title, pay or benefits.  Moreover, Plaintiff cannot have it both ways by asserting that his role was discriminatory because the responsibilities were too great, and yet also asserting that he was discriminated against when he was relieved of some of the responsibility.

1991).  Here, Plaintiff has not set forth any facts that he sought a promotion during the course of his employment at BTMU, or that others were promoted over him.  See Bowers v. New Jersey Judiciary, 2011 WL 3794947, at *10 (N.J. App. Div. Aug. 29, 2011) (no prima facie claim where plaintiff failed to apply for a promotion).  Moreover, Plaintiff was not qualified for a promotion because BTMU's policies require an employee to be in his position for at least one year before applying for a new job.  Defs.' R.56 Stmt. ¶¶ 168-170.  Accordingly, Plaintiff has not made out a prima facie case for discrimination arising from the alleged denial of a promotion.

2. Negative Performance Reviews and Termination

Two alleged adverse employment actions remain: (1) Plaintiff's negative performance reviews in April and July of 2013, and (2) his termination on August 14, 2013.  Defendants contend that these claims should be dismissed because they do not give rise to an inference of discrimination.[4]  Furthermore, Defendants note that Plaintiff cannot rebut Defendants' legitimate, non-discriminatory reasons for their actions.  The Court agrees.

First, Plaintiff points to his minority status as one of four African-American Vice Presidents of 475 total employees in the MCS Department to support his disparate treatment claims.  See Pl.'s Supp. Stmt. ¶ 24.  However, "raw evidence of the number of minority employees compared to the number of nonminority employees alone fails to prove unlawful discrimination." Daughtry v. Family Dollar Stores, Inc., 2011 WL 601270, at *7 (D.N.J. Feb. 16, 2011).

---

[4] Defendants' argument that Plaintiff's negative performance reviews are not adverse employment actions is unavailing.  Negative performance evaluation results alone do not constitute an adverse employment action "unless they have some 'tangible effect upon the recipient's employment.'" Foster v. Ashcroft, 2006 WL 1995305, at *2 (D.N.J. July 14, 2006) (quoting Turner v. Gonzalez, 421 F.3d 688, 695 (8th Cir. 2005)).  Here, a jury could reasonably conclude that Plaintiff's performance reviews directly led to his termination.  His supervisor, Mr. Prazdnik, recommended Plaintiff's release from his employment directly after reviewing Plaintiff's 2013 mid-year evaluation with him on July 30, 2013.

Next, Plaintiff argues that he was discriminated against because he had asked for BTMU to offer more diversity inclusion training.  Pl.'s Supp. Stmt. ¶ 24.  But Plaintiff's attempt to point to his own conduct to show that others discriminated against him based on his race is flawed. Plaintiff argues that a jury could "find a correlation between [his] having raised the 'flag' of discrimination and his rather abrupt termination."  Pl.'s Oppo. Br. at p. 33, Dkt. No. 48.  However, the causal relationship that Plaintiff suggests is the hallmark of a retaliation claim, and does not indicate that Defendants' conduct was based on his race—only his actions.[5]

Moreover, BTMU took steps to address Plaintiff's concerns, cutting against an inference that they received his suggestions negatively.  As Plaintiff wrote to the EEOC, he attended two meetings to discuss diversity training, which was followed by the launch of an inclusion training program in June 2013.  See Oguejiofo Ltr. to EEOC, Pl. Ex. 16 a p. 2.

Plaintiff otherwise supports his claims with speculation and generalization.  He claims that his colleagues were not "open-minded" because "people feel why would they be relating to this guy because they are not used to working with someone with my profile, and I complained about that."  Pl.'s Supp. Stmt. ¶ 22.

When asked why he believed that Defendants were treating him differently based on his race, Mr. Oguejofo responded:

> A: . . . when you are in a department where you have one race, up to 90 percent of one race in that department, my thing and most of them have not worked with an African American at the VP level so if I'm relating to that person they don't see me as a VP.

> Q: At what point did you conclude that . . . your performance evaluation was racially discriminatory?

> A: If somebody is adding misleading information or plain out lying about the information

---

[5] Plaintiff appears to raise a retaliation claim for the first time in his opposition brief.  See Pl.'s Opp'n Br. at pp. 36-39.  The Court does not address this claim because Plaintiff did not assert a retaliation claim, or any facts suggesting retaliation in his Complaint.

that goes into my performance evaluation and becomes how I will continue my livelihood, my career, I mean, what is the motive? . . . I keep saying the same thing over and over, they found it intolerable that this guy with this profile challenged them.

Id. ¶¶ 24, 28a.

Despite Plaintiff's subjective feelings, such "speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn." Lane v. Sears Logistics Servs., Inc., No. 11-6157, 2014 WL 1301549, at *4 (D.N.J. Mar. 31, 2014); see also Elliott v. Group Med. & Surgical Serv., 714 F.2d 556, 567 (5th Cir. 1983) (a "subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief"). In sum, the record does not contain any evidence from which a reasonable jury could find that Plaintiff's negative performance reviews and subsequent termination were tied to his race.

Even if Plaintiff establishes a prima facie case of discrimination, Defendants have met their burden under McDonnell Douglas to provide legitimate, non-discriminatory reasons for their actions. Defendants assert that Plaintiff's negative performance reviews and ultimate termination reflected disagreements over business decisions, ongoing performance issues, and unprofessionalism when interacting with managers and colleagues. Defs.' Br. at 17. Specifically, Plaintiff pushed for a larger overhaul of the Data Warehouse system than Mr. Borra and Mr. Fadoo believed was necessary. Defendants assert that Plaintiff's increased focus on the Data Warehouse distracted from his other responsibilities as IT Lead on the CBR and T360 projects, as well as his running nightly batches. Defs.' R.56 Stmt. ¶¶ 69-71, 83. They note Plaintiff's continued substandard performance through March 2013, including: missing a January deadline for the CBR project; failure to maintain communication with supervisors on the CBR project; losing his temper during meetings; and failure to address data production issues in nightly batch runs. These deficiencies were referenced in Plaintiff's April 2013 performance evaluation.

Plaintiff's performance did not improve before his mandatory mid-year evaluation. Plaintiff's new supervisor, Mr. Prazdnik, noted that Plaintiff "was not always a team player, was often abrasive and intolerant towards coworkers, acted in a disrespectful manner toward his new manager . . . , and was resistant to constructive professional criticism." Id. ¶ 139. Plaintiff missed a deadline when his colleague departed to India. Pl.'s Resp. Stmt. ¶ 146. In addition, Plaintiff's mid-year evaluation noted that Plaintiff needed to improve his communication with team members. Id. at 148.

Plaintiff does not set forth any facts to suggest that Defendants' reasons are pretextual. To show pretext, a plaintiff must point to evidence which: (1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonable conclude that each reason was a fabrication"; or (2) allows the factfinder to reasonably conclude that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994); see also Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005) ("To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent."). A plaintiff can demonstrate the latter by "showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." Fuentes, 32 F.3d at 765. A plaintiff must point to "some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." LaResca v.

17

American Tel. & Tel., 161 F. Supp. 2d 323, 335-6 (D.N.J. 2001).  Plaintiff does not meet this burden.

Although Plaintiff vigorously opposed his performance reviews, providing a 10-page rebuttal to his employer, a plaintiff's own disagreement does not demonstrate pretext.  Swider v. Ha-Lo Indus. Inc., 134 F. Supp. 2d 608, 628 (D.N.J. 2001); Valdes v. Union City Bd. of Educ., 186 F. App'x 319, 323 (3d Cir. 2006) (an employee's disagreement with his employer does not rebut an employer's proffered legitimate, nondiscriminatory reasons).

Moreover, Plaintiff's statements corroborate Defendants' narrative. Like Defendants, Plaintiff attributes the deterioration of his relationship with Defendants to his disagreement with them over a business decision.  Plaintiff testified, "most of the problems started when I challenged him on how they built the system."  Pl.'s Supp. Stmt. ¶ 10a.  Similarly, Plaintiff stated that from the time he "challenged" Mr. Fadoo and Mr. Borra over the "appropriate strategy for the data model" to the "end of November and December" "they made my stay within the bank a nightmare."  Id. ¶ 12a.  Plaintiff continued, "From that point on, the strategy was to find something wrong with me.  Anything I did at that point became an issue."  Id. ¶ 12b.  These issues were not related to Plaintiff's race or national origin.

Plaintiff argues that Defendants "found it intolerable that this guy with this profile challenged them."  Id.  ¶ 28b.  However, he does not point to any evidence suggesting that Defendants' reaction to his challenge was due to his race or national origin.  Plaintiff does not name others who similarly disagreed with their supervisors and fared differently from him.  If anything, evidence suggests that Plaintiff was treated similarly to others; three other individuals of two different races—one of whom was the same race as Defendants Mr. Borra and Mr. Fadoo— received a "2" rating in their annual performance at the same time as Plaintiff.  Defs.' R.56 Stmt.

¶ 110.  Accordingly, Plaintiff has not rebutted Defendants' legitimate, non-discriminatory reasons for giving Plaintiff poor performance ratings and terminating him.

### B.  Hostile Work Environment

Defendants argue that Plaintiff's hostile work environment claims must be dismissed because Defendants' conduct cannot be linked to Plaintiff's inclusion in a protected class, and that it was not severe and pervasive.  The Court agrees.

To state a hostile work environment claim, a plaintiff must show that (1) the employee suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability."  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013); see also Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2011).

Here, Plaintiff has failed to show that Defendants' conduct was tied to his race.  Plaintiff alleges that he was subject to yelling, intimidation and mistreatment, excessive assignments, negative performance reviews, and criticism.  Specifically, he claims he was criticized on the following occasions: four times from December 2012 to May 2013 when Mr. Fadoo yelled at him during meetings; unspecified times in December 2012 and January 2013 when Mr. Fadoo came into Plaintiff's office without knocking; two occasions in January and February 2013 when Mr. Fadoo "rebuked" Plaintiff for sitting in his office; and when Plaintiff received negative performance reviews in April and July 2013.  None of these incidences is facially discriminatory.[6]

---

[6] Plaintiff concedes that no supervisors at BTMU ever made disparaging or offensive comments to him regarding his race or national origin.  Defs.' R.56 Stmt. ¶¶ 10-11, 93, 152.

While facially neutral conduct alone may support a finding of hostile working environment, Plaintiff must show that the facially neutral conduct was motivated by discrimination. See Clegg v. Falcon Plastics, Inc., 2006 WL 887937, at *25 (3d Cir. April 6, 2006); Peace-Wickham v. Walls, 409 Fed. App'x 512, 520 n.1 (3d Cir. 2010) ("the presence or absence of [racially discriminatory statements] often proves helpful when evaluating whether facially neutral conduct is driven by invidious motives"). Plaintiff has not done this.

For instance, Plaintiff contends that on one occasion, his supervisor, Mr. Prazdnik, told him that Defendants Mr. Borra and Mr. Fadoo "were planning to get [him] fired," Pl.'s Supp. Stmt. ¶ 26, which Defendants dispute,[7] Defs.' R.56 Stmt. ¶ 122, n.5. Even if Defendants had made such a statement, there is no evidence that it stemmed from animosity towards Plaintiff's race or national origin. Indeed, Plaintiff has set forth a set of facts to suggest that his relationship with Mr. Borra and Mr. Fadoo deteriorated because of a disagreement about the strategy for the Data Warehouse—not because of Plaintiff's race or national origin.

A plaintiff may also show discrimination based on facially neutral conduct by showing that he was treated differently from others. Here, Plaintiff has not alleged that employees of other races were free from rebukes and criticism. Nor has Plaintiff alleged that any other African-American employees were subject to the same treatment as himself.

Because the Court dismisses Plaintiff's hostile work environment claim for failure to show intentional discrimination, it does not reach the severe or pervasive prong.

---

[7] The Court notes that Plaintiff's allegation involves hearsay. Nonetheless, Defendants deny that Mr. Prazdnik made such a statement. Defs.' R.56 Stmt. ¶ 122, n.5. Mr. Prazdnik explained, "What I told [Plaintiff], from what my recollection is, that if there's any perceived friction or disagreement . . . it would be better for him to allow for me to put him a position where he'd be successful."

### C. Individual Liability for Defendants Borra and Fadoo

Finally, Defendants argue that there is no individual liability for Plaintiff's former supervisors, Mr. Borra and Mr. Fadoo because they did not aid or abet discriminatory conduct. The Court agrees.

Unlike federal law, NJLAD provides for claims against individual employees who "aid, abet, incite, compel or coerce" any acts forbidden under the statute. N.J.S.A. § 10:5-12(e); see Tarr v. Ciasulli, 181 N.J.70, 83 (2004). To establish a claim for aiding and abetting liability under NJLAD, a plaintiff must show that: "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.'" Tarr, 181 N.J. 70, 84 (quoting Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 129 (3d Cir. 1999)).

Here, Plaintiff's claims against Mr. Borra and Mr. Fadoo fail because there is no underlying wrongful act which they aided. As such, Plaintiff's aiding and abetting claims fail.

### III. CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is **GRANTED**.

**Dated: September 20, 2016**

/s Madeline Cox Arleo
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**